# UNITED STATES DISTRICT COURT

for the

_____ District of _____

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

)
)
)
)
)
)

Case No.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❒ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
|  |  |

The application is based on these facts:

❒ Continued on the attached sheet.

❒ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## **AFFIDAVIT**

I, Farshid Hashempour, being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1.    I am a Detective with the Santa Ana Police Department ("SAPD") and also a federally deputized Task Force Officer ("TFO") presently working with the Federal Bureau of Investigation ("FBI").  As a TFO with the FBI, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.    I am assigned to the Orange County Violent Gang Task Force ("OCVGTF").  The OCVGTF is composed of federal and local law enforcement agencies, including, but not limited to, the FBI, the Internal Revenue Service-Criminal Investigations, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the SAPD, and detectives from the Anaheim Police Department.  The OCVGTF is responsible for, among other things, investigating violations of federal law committed by criminal street gangs, the Mexican Mafia, and other violent criminal organizations in Orange County.  Prior to this assignment with the FBI, I was a SAPD Police Officer and have been so employed for approximately eighteen years.

3.    I have specialized training and experience in investigations of narcotics trafficking and criminal street gangs.  During my tenure as a Police Officer, as well as an FBI

TFO, I have conducted and participated in numerous investigations of criminal activity, specifically including narcotics trafficking and violent offenses committed by street gangs. Since joining the OCVGTF in 2010, I have specialized in investigations of the Mexican Mafia and its subordinate gangs in Orange County. As part of these investigations, I have also learned about the drug trafficking organizations that supply street gangs with illegal narcotics.

## II. PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of an application for a warrant to search the following digital devices in the custody of the Federal Bureau of Investigation ("FBI"), in Santa Ana, California (collectively, the "SUBJECT DEVICES"), as described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. § 846 (Possession With Intent to Distribute Controlled Substances, Distribution of Controlled Substances, and Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances) (the "Subject Offenses"):

        a.    Black Wiko cellular phone ("SUBJECT DEVICE 1");

        b.    Black Motorola with purple case, Model XT1921-3, IMEI number 351841094368489 ("SUBJECT DEVICE 2")

        c.    Black Samsung, Model SM-J327T1, Serial number 327T1UVS2ARE1, IMEI number 359214/09149817/4 ("SUBJECT DEVICE 3")

      d.   Black LG cellular telephone, Model LMX410MK, IMEI number 355380-09-193358-7 ("SUBJECT DEVICE 4")

5.   Attachments A and B are incorporated herein by reference.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On or about September 5, 2019, the SAPD received a call for service regarding an individual with a gun at a Carl's Jr. restaurant in Santa Ana, California.  The caller said that a white female in a white Trailblazer was armed with a handgun. The caller also said that the female had pulled out the gun and waved it around.  SAPD Officers arrived at the scene and were greeted by a person who appeared to be distraught and in a panic.  The person told Officers he was robbed by a white female in a white Chevy Tahoe or Suburban with a license plate starting with the number "7."

8.   Officers then went around the Carl's Jr. and found a white SUV that was occupied by a white female who matched the description provided by the person they had just contacted.

Officers contacted the Female, later identified as HEATHER ANN BRADLEY ("BRADLEY"), who was seated in the driver's seat of the vehicle, which was registered to BRADLEY.  BRADLEY was removed from the car and detained while Officers searched the vehicle to find the firearm reported.  An SAPD Officer searching the rear compartment of the white SUV located three trash bags containing twenty-three rectangular packages containing suspected controlled substances weighing approximately 58 pounds.  The SUBJECT DEVICES related to this case were also found in the vehicle.

9.    The suspected controlled substances were sent to the lab and confirmed to be 19.11 kilograms of cocaine and 4007 grams of fentanyl.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Report of Firearm and Robbery**

11.   On or about September 5, 2019, at approximately 10:29 p.m., SAPD Officers M. Casillas and P. Marshall were working uniformed patrol in the same marked police unit when they were dispatched to the parking lot of the Carl's Jr. restaurant, located at 1809 East Edinger Avenue, Santa Ana, California.  The calling party had called SAPD Dispatch to advise that he had seen a white female in a white colored Chevrolet Trailblazer brandishing a firearm.  The caller stated, "I saw her pull out the gun and everything and then she received a luggage."

4

12.  When SAPD Officers Casillas and Marshall arrived at the Carl's Jr., they contacted a male later identified as Adrian Vasquez.  Vasquez appeared to be distraught, panicked, sweating profusely, and speaking rapidly.  Vasquez stated he had low blood sugar.  Vasquez told the officers he had been robbed by a white female armed with a handgun.  Vasquez said the female was in a white Tahoe or Suburban with a license plate starting with "7."

13.  I later listened to the 911 calls made by the calling party who had initially reported the incident to SAPD.  The caller was a male but did not identify himself.  The caller informed the dispatcher that he had observed a White Female in a white Chevy Trailblazer in the parking lot of the Carl's Jr. The same male subject called back to inform dispatch that he had observed the SAPD Officers arrive at the scene, but they had yet to contact the Chevy Trailblazer, which was still parked in the Carl's Jr. parking lot.  I also watched the Officers' Body Worn Camera ("BWC") videos documenting the entire incident, and more specifically their interactions with Vasquez and BRADLEY.  Based on voice comparison of the BWC video and the 911 audio, I made the determination that the individual calling 911 was not Adrian Vasquez.

14.  After speaking to Vasquez, Officer Marshall and Officer Casillas drove through the parking lot of the Carl's Jr. and observed a white Chevy Trailblazer, bearing California license 7TDL743, parked on the east side of the Carl's Jr., which matched the description provided by the calling party and

Vasquez.  The vehicle was located in the general area described by Vasquez as the location where the robbery occurred.  The Officers observed that the vehicle was occupied by a white female, later identified as BRADLEY.  A records check of the vehicle's license plate revealed that it was registered to BRADLEY out of Chula Vista, California.

**B.   Recovery of Cocaine, Fentanyl, and SUBJECT DEVICES from BRADLEY's Vehicle**

15.  Upon finding a vehicle that matched the description provided by both the 911 caller and Vasquez, Officer Casillas and Officer Marshall cautiously approached the Chevy Trailblazer and contacted BRADLEY, who was the sole occupant of the vehicle, seated in the driver's seat.  BRADLEY told Officer Marshall that she was waiting for a friend, who was on his way to the Carl's Jr.  Due to the nature of the call and statements made by Vasquez, Officer Marshall removed BRADLEY from the vehicle and handcuffed her for purposes of officer safety.  Officer Casillas conducted a search of BRADLEY's person, but did not find anything.  BRADLEY confirmed that the vehicle belonged to her, but did not give Officer Casillas consent to search the vehicle. Officer Casillas then informed BRADLEY that they were investigating reports of a robbery involving a suspect who matched BRADLEY's description.  Officer Casillas advised BRADLEY that she was being detained and was not under arrest before seating BRADLEY to the rear of her marked police unit.

16.  Officer Casillas and Officer Marshall searched BRADLEY's vehicle in search of the firearm and stolen items

described previously to the officers by Vasquez.  The search of the rear storage compartment of BRADLEY's white Chevy Trailblazer revealed three trash bags containing twenty-three rectangular packages that appeared to be tightly wrapped in plastic and vacuum sealed.  The rear storage compartment on the Chevy Trailblazer is located on the other side of the rear passenger seats and is accessible from the inside of the vehicle without having to open the rear lift gate.  Four of the bundles were wrapped in packaging that consisted of a blue line in the center with the letters "GHC" written on the line.  The remaining nineteen packages were also tightly wrapped with "OXXO" tape or labeling, which is the name of a chain of convenience stores.  Based on their training and experience, Officer Marshall and Officer Casillas formed the opinion that items found in the trash bags were a controlled substance.  The officers continued their search of the Chevy Trailblazer and did not find any of the items supporting Vasquez's claim of a robbery to include the firearm, the wallet containing $250 or the Black iPhone 8—these latter items being the items Vasquez said were stolen from him, as described below in ¶ 19.

17.  During his initial contact with BRADLEY, Officer Marshall observed SUBJECT DEVICE 1 resting on top of BRADLEY's legs while she was seated in the driver's seat of the white Chevy Trailblazer.  I later reviewed Officer Marshall's body-worn camera video and could see SUBJECT DEVICE 1 on BRADLEY's lap as she sat in the driver's seat.  During an interview of BRADLEY at the Santa Ana Jail, BRADLEY admitted that SUBJECT

DEVICE 1 belonged to her.  While searching BRADLEY's vehicle,
Officer Marshall found SUBJECT DEVICE 2 on top of the center
console.  On Officer Marshall's body-worn camera video, I
observed him pick up SUBJECT DEVICE 2 from the general vicinity
of the center console, but I could not see clearly the exact
location of SUBJECT DEVICE 2 because of the camera angle.  As
written in his report, Officer Marshall located SUBJECT DEVICE 3
in between the center console and the front passenger seat of
the Chevy Trailblazer.  On Officer Marshall's body-worn camera
video, I could clearly see Officer Marshall remove SUBJECT
DEVICE 3 from in between the front passenger seat and the center
console.  SUBJECT DEVICE 4 was found by Officer Marshall inside
a black bag on the front passenger floor board, which was
substantiated by Officer Marshall's body-worn camera, which
showed him looking through what appeared to be a large black
woman's purse.  On the video, SUBJECT DEVICE 4 could be seen
inside one of the pockets of the purse.

### C.  Statements by Vasquez to Officer Nolan While the Search Occurred

18.  SAPD Officer Nolan also assisted on the call with
other officers who were dispatched to the Carl's Jr. restaurant.
After Officers Casillas and Marshall went to contact BRADLEY,
Officer Nolan continued the interview of Vasquez.  Vasquez
stated he was originally from Chula Vista, California, and had
come to Santa Ana to visit his grandmother; Vasquez was unable
to provide his grandmother's address.  Vasquez said that at
about 8:20 p.m. he ordered an Uber to pick him up and transport

him to the Carl's Jr.  Vasquez stated he was talking to his
father on his cell phone and walking in the Carl's Jr. parking
lot when he noticed a vehicle (later identified as the
Trailblazer) that was occupied by a white female.  Vasquez
described the interior of the vehicle was illuminated by the
vehicle's dome light, which allowed him to see the woman seated
in the driver's seat holding a firearm.  Vasquez said he told
his father what he had witnessed and provided his father with
the license plate associated with the vehicle.

19.  According to Vasquez, the white female then exited the
vehicle and asked Vasquez with whom he was speaking.  Vasquez
said he denied speaking to anyone on his phone and disconnected
the phone call with his father.  Vasquez said the white female
then demanded his cell phone.  Vasquez said that although he did
not notice if the female was still holding the firearm as she
exited the vehicle, Vasquez handed the female his black iPhone 8
out of fear for his life since he had just seen her in
possession of the handgun.  Vasquez said the female then asked
Vasquez for other possessions while she grabbed at pockets of
Vasquez's shorts.  Vasquez said the female asked Vasquez for his
wallet, which he removed from his right front pocket and handed
to the female.  Vasquez later informed the Officers that his
wallet contained $250 in United States Currency along with
personal identification documents such as his California Driver
License and Social Security card.  Vasquez said the female then
told Vasquez, "Get out of my face," at which time Vasquez walked
away and into the Carl's Jr. restaurant, where he told the

restaurant employees that he had just been robbed.  Vasquez described the white female as being in her late twenties or early thirties, with long blonde hair, green eyes and wearing a white shirt.  Vasquez could not remember the license plate number to the vehicle he had seen the suspect inside of, but did remember that it started with the number seven.

20.   While speaking with Vasquez, Officer Nolan was advised by Officer Marshall and Officer Casillas that they had located a vehicle and suspect, both of which matched the description provided by Vasquez.  At approximately 11:48 p.m., Officer Nolan used his SAPD issued Police Officer Index to read Vasquez an admonishment for a field line-up.  Vasquez verbally acknowledged the admonishment and agreed to participate in the field show-up. During a field show-up, Vasquez positively identified BRADLEY as the suspect in the robbery and the white Chevy Trailblazer as the vehicle in which Vasquez had seen BRADLEY brandishing a firearm.

21.   Later the same evening, at about 11:58 p.m., Officer Nolan called Vasquez's father and spoke to him regarding the events of that evening.  Despite a language barrier, Officer Nolan understood that Vasquez's father did speak to his son, Adrian, earlier in the evening.  Vasquez's father believed that his son was with his girlfriend, Beatrice, but did not mention anything to substantiate Vasquez's claim that he told his father about the vehicle and the woman with a gun before hanging up the phone.

**D.   Arrest of BRADLEY and Vasquez**

22.   BRADLEY and Vasquez were arrested and transported to
the Santa Ana Jail.  Vasquez was initially arrested on the
belief that he and BRADLEY were working in concert since both
individuals reside in Chula Vista, California, and due to the
fact that officers did not find any evidence supporting
Vasquez's claim that BRADLEY robbed him.

**E.   BRADLEY's Statements**

23.   At the Santa Ana Jail, Officer Marshall used his SAPD
issued Police Officer Index to read BRADLEY her Miranda Rights.
BRADLEY answered, "Yes," when asked if he understood each of her
rights.  During the interview, BRADLEY confirmed that the white
Chevy Trailblazer was registered in her name.  When Officer
Marshall asked if everything found in the vehicle belonged to
her, BRADLEY responded, "Um, well I thought everything in the
car was mine, but whatever you pulled out is definitely not
mine."  Officer Marshall asked BRADLEY if there were any
cellular phones in the vehicle.  BRADLEY identified SUBJECT
DEVICE 1 as belonging to her.  Officer Marshall then asked
BRADLEY the reason why she was in Santa Ana that evening.
BRADLEY stated that she was there to "pick up somebody."  When
Officer Marshall asked BRADLEY to identify the person she was
supposed to pick up, BRADLEY asked Officer Marshall for an
attorney, thus concluding their interview.

**F.   VASQUEZ's Statements**

24.   In an interview room at Santa Ana Jail, Officer
Marshall read Vasquez his Miranda Rights from his SAPD issued

Police Officer Index.  Vasquez answered, "Yes," when asked if he understood each of his rights.  During the interview, Vasquez reiterated the story he gave the Officers in the parking lot of the Carl's Jr. restaurant.  Vasquez said that he was at his grandmother's house in Santa Ana, when he ordered an Uber to take him to the Carl's Jr. to get something to eat.  While walking through the parking lot towards the restaurant, Vasquez said he observed BRADLEY in the vehicle with a firearm.  Vasquez stated that BRADLEY then exited her vehicle and confronted him by asking, "Who you talking to?"  Possibly believing that Vasquez was on the phone with the police, Vasquez claimed that BRADLEY called him a "snitch."  According to Vasquez, BRADLEY then took his iPhone and wallet containing $250 in cash.  Vasquez denied knowing BRADLEY and said that he was never in her vehicle.

### G.   Drug Test

25.  The controlled substances recovered from BRADLEY's car were sent to the Drug Enforcement Administration ("DEA") lab for testing.  I have reviewed the DEA lab report for those substances, which identifies them as 19.11 kilograms of cocaine and 4007 grams of fentanyl.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

    d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of

meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

    e.    Individuals engaged in the illegal purchase or sale of controlled substances often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

28.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    29.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition

16

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BRADLEY's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BRADLEY's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    31.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

    32.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations

of the Subject Offenses will be found on the SUBJECT DEVICES, as described in Attachment A.

_____
FARSHID HASHEMPOUR, Task Force
Officer
Federal Bureau of
Investigation

Subscribed to and sworn before me
This 5th day of November, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), were seized on September 5, 2019, and are currently maintained in the custody of the FBI in Santa Ana, CA:

1.    Black Wiko cellular phone ("SUBJECT DEVICE 1");

2.    Black Motorola with purple case, Model XT1921-3, IMEI number 351841094368489 ("SUBJECT DEVICE 2")

3.    Black Samsung, Model SM-J327T1, Serial number 327T1UVS2ARE1, IMEI number 359214/09149817/4 ("SUBJECT DEVICE 3")

4.    Black LG cellular telephone, Model LMX410MK, IMEI number 355380-09-193358-7 ("SUBJECT DEVICE 4")

## ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. § 846 (Possession With Intent to Distribute Controlled Substances, Distribution of Controlled Substances, and Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances) (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the Subject Offenses;

i

d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition were bought, sold, or otherwise distributed;

e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, guns, or ammunition;

f.   Contents of any calendar or date book;

g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as

ii

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.    records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

I.   <u>**SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)**</u>

3.   In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

search for and attempt to recover deleted, "hidden," or
encrypted data to determine, pursuant to the search protocols,
whether the data falls within the scope of the items to be
seized.

        ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

        iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

        e.  If the search team, while searching a SUBJECT
DEVICE, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that
SUBJECT DEVICE pending further order of the Court and shall make
and retain notes detailing how the contraband or other evidence
of a crime was encountered, including how it was immediately
apparent contraband or evidence of a crime.

        f.  If the search determines that a SUBJECT DEVICE
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

        g.  If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j. After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress HEATHER ANN BRADLEY's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of HEATHER ANN BRADLEY's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.